## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **(1) JOY JACKSON as durable power of attorney for LONDELL JACKSON,** | |
| **Plaintiff,** | **Case No**. CIV-23-319-JD |
| **v.** | **JURY TRIAL DEMANDED** |
| **(1) TERRACE GARDENS NURSING CENTER LLC D/B/A KINGWOOD SKILLED NURSING AND THERAPY** | |
| **(2) AMITY CARE, LLC** | |
| **(3) BRIDGES ESOP, INC.** | |
| **Defendant(s).** | |

## PLAINTIFF'S COMPLAINT FOR DAMAGES

The Plaintiff, by and through undersigned counsel, submits this Complaint for Damages against the above-named Defendants, and in further support, states and alleges as follows:

### PLAINTIFF

1.      Plaintiff, Joy Jackson as Durable Power of Attorney for Londell Jackson ("Resident"), are, at all times relevant hereto, adults over the age of 21.

2.      Joy Jackson is a citizen of the state of Texas.

3.      Londell Jackson is a citizen of the state of Texas.

4.     In February of 2022, a mice infestation started at Terrace Gardens Nursing Center LLC d/b/a Kingwood Skilled Nursing and Therapy located at 1921 Northeast 21st Street, Oklahoma City, OK 73111.

5.     Resident's room was directly across from the Facility's kitchen.

6.     Mice crawled into Resident's bed at night, and he would scream, but nobody came to help.

7.     On or about March 21, 2022, Resident went to the hospital because he was delirious and having discomforat in his eyes. Resident was diagnosed with an infection.

8.     Resident went back to the Facility on the next day. The Facility moved Resident to a different room after two weeks.

9.     The Facility hired two separate companies to address the mice infestation, but it did not help.

10.     On or about June 17, 2022, Joy Jackson visited and saw a mouse in Resident's bed near his feet.

11.     Resident was a quadripilegic and could not move in his bed without assistance.

12.     Between February and the end of June 2022, Resident was continuously bitten by mice; screaming out in pain; and no one from the Facility came to help.

13.     Resident has permanent scars on his buttocks, legs, and hands.

14.     On June 9, 2022, the United States Department of Health and Human Services issued a deficiency regarding the rodent attacks on Plaintiff stating the

Facility violated CFR § 483.90(i)(4), requiring it to maintain an effective pest control program so that the facility is free of pests and rodents.

15.     The statement of deficiency stated in relevant part:

> Make sure there is a pest control program to prevent/deal with mice, insects, or other pests. Based on record review, observations and interviews, the facility failed to maintain an effective pest program. The DON identified 56 residents resided in the facility.

16.     On June 8, 2022, at 8:25 a.m., the kitchen and pantry areas were observed to have live traps and sticky pad/traps for rodents.

17.     In the kitchen area, there was dust/debris with a build-up on the floor, along the wall, behind the wire shelving that stored pans/lids. The debris contained small mouse droppings.

18.     In the pantry area, there was a yellow/brown stain and dust/debris with a build-up on the floor, around the wall. The debris contained small mouse droppings.

19.     On June 8, 2022, at 8:25 a.m., the DM was asked if there were issues with rodents. She stated the pest control checks the traps and maybe come once a week.

20.     The DM was shown the debris/mouse droppings in the kitchen and pantry. They stated the evidence may be from before because mice had not been seen for a while. They were unable to identify the last event a mouse had been sighted in the kitchen or panty.

21.     On June 8, 2022, at 8:40 a.m., mouse droppings were observed in the corner and behind the door of room 301.

22.     At 8:44 a.m., debris and mouse droppings were observed in the corner of room 302 B. Resident #4 was asked if there were problems with mice. Resident #4 stated six mice had been seen but had not seen any mice since last week.

23.     At 8:45 am., debris/mouse droppings were observed along the wall and behind the door in room 303. Resident #5 stated there had been a lot of mice and now there are traps. Resident #5 stated the staff check the traps every day. Resident #5 stated mice had not been seen for about a week.

24.     At 8:50 am debris and mouse droppings were observed behind the door of room 304. Residents were not able to provide information.

25.     On June 8, 2022, at 1:25 p.m., the administrator was shown the findings in the kitchen, pantry and resident rooms. The administrator stated they had been fighting a mouse problem for several months, but it had improved.

26.     On June 8, 2022, at 3:30 pm, the administrator was asked when the issues with mice initially begin.  The administrator stated sometime between November and January. The administrator was asked when the last known siting of mice had occurred. The administrator stated on May 17, 2022, and a grievance form was completed in order to track the concerns. The administrator stated the facility changed vendors for pest control, the situation has improved, but they continue to deal with mice.

## DEFENDANTS

27.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### Terrace Gardens Nursing Center LLC ("FACILITY")

4

28.    At all times relevant, Terrace Gardens Nursing Center LLC ("FACILITY"), was a limited liability company formed and registered under the laws of the state of Oklahoma who owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Terrace Gardens Nursing Center LLC d/b/a Kingwood Skilled Nursing and Therapy an Oklahoma skilled nursing facility located at 1921 Northeast 21st Street, Oklahoma City, OK 73111.

29.    As such, FACILITY was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

30.    Consequently, FACILITY owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

31.    No member of Facility is a citizen of Texas.

32.    On information and belief, Don Greiner is the sole member of the Facility and is an Oklahoma citizen.

**AMITY CARE, LLC ("AMITY CARE")**

33.    At all times relevant to this action, Defendant Amity Care, LLC was a limited liability company formed and registered under the laws of the state of Oklahoma, authorized to do business in the State of Oklahoma, and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

34.    At all times relevant, Amity Care, and/or individuals or entities acting on its behalf, managed, maintained, and/or controlled – in whole or in part – the Facility.

35.     Amity Care, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a.  Staffing budgets;

    b.  The development and implementation of nursing policies and procedures;

    c.  The hiring and firing of the administrator; and

    d.  Training and supervising nursing staff persons.

36.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

37.     Consequently, Amity Care owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

38.     No member of Facility is a citizen of Texas.

39.     On information and belief, Don Greiner is the sole member of the Amity Care and is an Oklahoma citizen.

### BRIDGES ESOP, INC.

40.     BRIDGES ESOP is a for profit domestic corporation located at 4350 Will Rogers Parkway, Suite 300, Oklahoma City, OK 73108. This defendant was directly involved in the day-to-day operations of the numerous skilled nursing facilities under its control, including Facility.

41.     At all times relevant, BRIDGES ESOP, and/or individuals or entities acting on its behalf, managed, maintained, and/or controlled – in whole or in part – the Facility.

42.     BRIDGES ESOP, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a.  Staffing budgets;

    b.  The development and implementation of nursing policies and procedures;

    c.  The hiring and firing of the administrator; and

    d.  Training and supervising nursing staff persons.

43.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

44.     Consequently, BRIDGES ESOP owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

45.     BRIDGES ESOP's is an Oklahoma corporation with its principal place of business in Oklahoma.  Thus, BRIDGES ESOP is an Oklahoma citizen.

**DEFENDANTS' JOINT ENTERPRISE/VENTURE**

46.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

47.     Defendants Facility, AMITY CARE; and BRIDGES ESOP; ("Joint Venture Defendants") were engaged in a joint venture in that:

    a.  The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate the Facility, an Oklahoma licensed nursing home;

    b.  The Joint Venture Defendants had had a common purpose to operate the Facility, an Oklahoma licensed nursing home;

    c.  The Joint Venture Defendants had a community of pecuniary interest in the operation of the Facility, an Oklahoma licensed nursing home; and

    d.   The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of the Facility, an Oklahoma licensed nursing home.

48.    There has been a close relationship between the Joint Venture Defendants at all times relevant.

49.    As a consequence of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at the Facility.

<strong>JURISDICTION AND VENUE</strong>

50.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

51.    Plaintiff is a citizen of the state of Texas.

52.    Each member of defendant Facility are all citizens of the state of Oklahoma.  Thus, Facility is a citizen of the state Oklahoma by way of each of its members being citizens of the state of Oklahoma.

53.    Each member of defendant Amity Care are all citizens of the state of Oklahoma.  Thus, Amity Care is a citizen of the state Oklahoma by way of each of its members being citizens of the state of Oklahoma.

54.    BRIDGES ESOP's principal place of business is in Oklahoma.  are all citizens of the state of Oklahoma.  Thus, BRIDGES ESOP is a citizen of the state Oklahoma.

55.    Therefore, Plaintiff brings her claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

56.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Oklahoma, thereby making venue proper in this Court.

## AGENCY

57.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

58.     The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

59.     Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

60.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### Defendants' Treatment of Resident

61.     Defendants failed to keep Resident safe from rodent attack between February and the end of June 2022.

62.     Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from FACILITY,

AMITY CARE, and BRIDGES ESOP, or any other staff member ever provide any sort of in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of rodent infestation and rodent attacks on Resident.

63.   Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from FACILITY, AMITY CARE and BRIDGES ESOP, or any other staff member ever implement the appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of rodent infestation and rodent attacks on Resident.

64.   Upon information and belief, while Resident was a resident at the Facility, the Facility did not have an adequate number of staff working on a daily basis at the Facility to meet Resident's needs, perform the interventions required to prevent rodent infestation and rodent attacks on Resident.

## Management of the Facility

### Levels of Necessary Care & Expected Staffing

65.   CMS is the federal agency that is tasked with regulating all nursing facilities in this country.  Through the years, CMS has sponsored multiple studies to determine the amount of time that RNs, LPNs, and CNAs in nursing facility spent caring for residents as well as other elements of resident care.

66.   Medicare has commissioned and made available to all nursing home studies and data showing the number of minutes of nursing and nursing aide care a

person at a specific RUG level should be expected to require, which Medicare calls "expected staffing."

67.     Because of these studies, CMS is able to set a number of hours of direct care that they expect to be provided to residents by RNs, LPNs, and CNAs based on the nursing facility's total acuity level.

68.     This expectation is expressed in terms of "hours per patient day" or "HPPD".

69.     With the information gleaned from the MDSs that are provided to CMS by each skilled nursing facility, CMS is able to determine an HPPD that is expected for each nursing facility in the country.  This is referred to as the "expected HPPD" or simply "expected staffing."

70.     When these RUG scores are combined for all residents in a skilled nursing facility, the nursing home knows exactly how many minutes of nursing and nursing aide care should be provided, on average, to meet the expected care needs of their residents.

71.     The only way to determine the total acuity level and corresponding RUG of each of the residents at a facility such as the Facility on any given day is by examining section Z of every MDS in effect on that day.

72.     It is only this empirical data from the MDS Part Z that is necessary to determine the acuity for any particular resident, and thus determine the staffing for a facility.

73.     It is not necessary to disclose or review any residents' information and the relevant information contained in Section Z of the residents' MDS forms can easily be redacted to prevent unnecessary disclosure of HIPPA protected health information.

### Cost Reporting & Staffing Information

74.     Nursing facilities, like the Facility, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10". The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

75.     Included with the cost reports are extensive details as to how much money the nursing facility spent on RNs, LPNs, and CNAs. The cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

76.     By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident per day for the time period covered by that particular cost report. This number is referred to as the "reported HPPD".

77.     CMS allows the facilities to include all paid hours in the "reported HPPD." Thus, that number does actually reflect true direct care hours, but is inflated due to the fact that "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.

78.     The Facility was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.

79.     To determine more accurate direct-care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employees work. This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data Reports", or some other similarly named report depending on the time-keeping system used by the nursing facility.

80.     The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility.  This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period including a year, a quarter, a month, or a day.

81.     Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

82.     Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

**Undercapitalization/Underfunding at the Facility**

83.     FACILITY, AMITY CARE, and BRIDGES ESOP had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their

residents' comprehensive assessments and plans of care and prevention of rodent infestation and rodent attacks on Resident.

84.     FACILITY, AMITY CARE, and BRIDGES ESOP had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents and prevent rodent infestation and attacks on residents.

85.     Upon information and belief, FACILITY and AMITY CARE, had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff to prevent rodent infestation and attacks on residents.

86.     Upon information and belief, no individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

87.     Transactions directed by BRIDGES ESOP left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

**LEGAL BASIS FOR BRIDGES ESOP AND AMITY CARE'S LIABILITY**

88.     BRIDGES ESOP directed, operated and managed the day-to-day functions of their nursing facilities – including the Facility – by developing and implementing policies, practices and procedures affecting all facets of the Facility, including resident care and the ability to prevent rodent infestation and attacks on residents.

89.     These policies manipulate and control the physical and financial resources and prohibit decision making at the Facility level.

90.     This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents and prevent of rodent infestation and rodent attacks on Resident.

91.     These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of the Facility's residents and prevent of rodent infestation and rodent attacks on Resident.

92.     BRIDGES ESOP and AMITY CARE affirmatively chose and decided to establish such operations and demand they be implemented.

93.     Upon information and belief, such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the facility's staff.

94.     BRIDGES ESOP and AMITY CARE consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the

acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards, and therefore prevent rodent infestation and attacks on residents.

95.     BRIDGES ESOP and AMITY CARE and the other defendants conducted themselves in a manner which indicated a joint venture/enterprise amongst them, to wit:

   a.  The shared interest in the operation and management of nursing facilities;

   b.  The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

   c.  The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing nursing facilities.

96.     Oklahoma law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

97.     BRIDGES ESOP and AMITY CARE share a common interest in the operation and management of nursing facilities, including the Facility; maintains agreements to share in the profits or losses of the operation of nursing facilities described herein; and operates on a daily basis evincing conduct which indicates their cooperation in the venture of operating and managing nursing facilities for profit.

98.     BRIDGES ESOP and FACILITY and AMITY CARE, took direct, overt and specific actions to further the interest of the joint enterprise.

99.     These actions were taken through a joint venture/enterprise or through BRIDGES ESOP and FACILITY and AMITY CARE's officers, directors, managers and or employees.

100.    BRIDGES ESOP had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

101.    Further, because BRIDGES ESOP and FACILITY and AMITY CARE, had an equal right to direct or control their venture, as well as to direct or control the operation and management of the Facility.

**Direct Participation/Individual Actions**

102.    BRIDGES ESOP and AMITY CARE were always material to this lawsuit in the business of managing and operating a network of nursing homes throughout the State of Oklahoma. One such nursing home was the Facility where Resident was admitted for care and treatment.

103.    At all times material to this lawsuit, BRIDGES ESOP and AMITY CARE was fully aware that the delivery of essential care services in each of their nursing homes – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and (3) payor mix.

104.    At all times material, BRIDGES ESOP and AMITY CARE made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures.   More particularly, BRIDGES ESOP and AMITY CARE determined:

    a.   The number of staff allowed to work in their chains of nursing homes including the Facility;

    b.   The expenditures for staffing at the nursing homes including the Facility;

    c.   The revenue targets for each nursing home including the Facility;

    d.   The payor mix, and, census targets for each nursing home including the Facility;

    e.   Patient recruitment programs and discharge practices at each nursing home including the Facility.

105.   All cash management functions, revenues and expenditure decisions at the nursing home level – including the Facility – were tightly managed, directed, and supervised by BRIDGES ESOP and AMITY CARE.

106.   It was the choices made by BRIDGES ESOP and AMITY CARE which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

107.   BRIDGES ESOP and AMITY CARE formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

108.   The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by BRIDGES ESOP and AMITY CARE was implemented and such application was carefully supervised and enforced.

109.   Following the mandates, the Facility functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as BRIDGES ESOP and AMITY CARE deemed appropriate.

110.    Accordingly, such manipulation by BRIDGES ESOP and AMITY CARE as to staffing and census were motivated by the financial needs of BRIDGES ESOP and AMITY CARE and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

111.    Instead of abiding by their duty to care for the residents, BRIDGES ESOP and AMITY CARE chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

112.    BRIDGES ESOP and AMITY CARE, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

113.    At the same time, BRIDGES ESOP and AMITY CARE chose to design, create, implement and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

114.    In so doing, BRIDGES ESOP and AMITY CARE disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Facility, by the State of Oklahoma, and the federal government.

**Corporate Malfeasance**

115.   BRIDGES ESOP and AMITY CARE consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

116.   Accordingly, BRIDGES ESOP and AMITY CARE, by their operational choices and decision making, and in order to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

117.   These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Oklahoma and federal government imposed upon BRIDGES ESOP and AMITY CARE and the Facility.

118.   Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death.  This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

119.   During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, as a result of the acts, omissions, decisions and choices made by BRIDGES ESOP and AMITY CARE in operating the Facility.

120.   During Resident's residency at the Facility, BRIDGES ESOP and AMITY CARE negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe and protective environment, and that, as a result of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.

121.   BRIDGES ESOP and AMITY CARE manages, operates and directs the day-to-day operations of the Facility and BRIDGES ESOP and AMITY CARE are liable for this direct involvement in the operations of such Facility. BRIDGES ESOP and AMITY CARE is therefore liable to the Plaintiff for the neglect of and injuries to Resident.

122.   The Facility and BRIDGES ESOP and AMITY CARE have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

    a.   Chosen to disregard the duties and responsibilities which the Facility, as a licensed nursing home, owed to the State of Oklahoma and its residents;

    b.   Created the dangerous conditions described by interfering with and causing the Facility to violate Oklahoma statutes, laws and minimum regulations governing the operation of said nursing home;

    c.   Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management and day to day operation of the Facility;

    d.   Caused the harm complained of herein; and

    e.   Choosing to disregard the contractual obligations owed to the State of Oklahoma and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

## COUNT I - (Ordinary Negligence v. All Defendants)

123.   Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

124.   At all times material hereto Resident was in a defenseless and dependent condition.

125.   Furthermore, Defendants owed a specific duty to comply with those minimum rules and regulations as detailed in *Count Two: Negligence Per Se for Violation of Nursing Home Regulations Imposed by Statute* below. Insomuch as these regulations establish and are probative of the standard of care and the duties owed by defendants to Resident, they are incorporated herein

126.   As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care and treatment.

127.   At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

128.   At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

129.   These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

130.   These duties required Defendants to have sufficient and qualified staff at the Facility nursing home to ensure the proper care for, and treatment of all residents including Resident and prevent rodent infestation and rodent attacks on Resident.

131.   These duties required Defendants to ensure that the Facility' nurses and other staff were properly educated and trained with regard to the care for, and treatment of all residents including Resident and prevent rodent infestation and rodent attacks on Resident.

132.   These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident and prevent rodent infestation and rodent attacks on Resident.

133.   Specifically, during the course of their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

   a. Failing to adequately assess Facility's risk of rodent infestation.

   b. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition.

   c. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision.

d. Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding the prevention of rodent infestation and rodent attacks on Resident.

e. Failing to provide adequate assistive devices and interventions regarding the prevention of rodent infestation and rodent attacks on Resident.

f. Failing to timely report Resident's changes in condition to a physician.

g. Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of injury from rodent infestation and rodent attacks on Resident.

h. Failing to timely transfer Resident to a Facility that could provide adequate care.

i. Failing to properly supervise and train the employees, agents and/or servants of the Defendant who were responsible for the care and treatment of Resident and the prevention of rodent infestation and rodent attacks on Resident.

j. Failing to have and/or implement appropriate policies and procedures regarding the prevention of rodent infestation and rodent attacks on Resident..

k. Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of rodent infestation and rodent attacks on Resident.

l. Failing to ensure the facility was properly capitalized and staffed.

m. Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation;

134. As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; and other damages.

135.   The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of Resident.

136.   At the time defendants caused and allowed rodent attacks on Resident, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

137.   Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants aggravating circumstances damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

138.   As a direct and proximate result of defendant's acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

WHEREFORE, Plaintiff, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and

aggravating circumstances damages, the costs of this action, and for such other and

further relief as the Court deems just and proper.

### COUNT TWO:  STATUTORY VIOLATION OF ENUMERATED RIGHTS AND NEGLIGENCE *PER SE* UNDER THE NURSING HOME CARE ACT AGAINST THE FACILITY ("Nursing Home Care Act Defendant")

139.   Plaintiff incorporates by reference the allegations previously set forth

and further alleges as follows.

140.   At all times material to this lawsuit, Facility was under a continuing duty

to ensure that their staff was familiar with and complied with all resident rights and

duties established under the Nursing Home Care Act, OKLA. STAT. tit. 63, § 1-1901, *et*

*seq*.

141.   More particularly, Nursing Home Care Act defendant caused injury to

Resident by violating the following express rights of Resident, including but not

limited to:

    a.    violating Resident's right to receive adequate and appropriate medical care consistent with established and recognized medical practice standards within the community as established under OKLA. STAT. tit. 63, § 1-1918(B)(5);

    b.    violating Resident's right established under OKLA. STAT. tit. 63, § 1-1918(B)(12) to be free from neglect and mental abuse;

    c.    violating Resident's right pursuant to OKLA. STAT. tit. 63, § 1-1918(B)(7) to receive services with reasonable accommodation of the individual needs of RESIDENT; and

    d.    interfering with Resident's right to be fully informed by her attending physician of his medical condition as established also under OKLA. STAT. tit. 63, § 1-1918(B)(5).

61.     Additionally, Nursing Home Care Act defendant violated its duties owed to Resident under OKLA. STAT. tit. 63, § 1-1918(D) by failing to provide appropriate staff training to implement the rights set forth above.

142.    The above violations, operating singularly and in combination caused injury to Resident. Accordingly, Plaintiff invokes the provisions of OKLA. STAT. tit. 63, § 1-1918(F) seeking all damages recoverable and allowed by law.

143.    Furthermore, Nursing Home Care Act defendant engaged in acts and omissions which constitute statutory "neglect" within the meaning of: (a) OKLA. STAT. tit. 63, § 1-1902(15) which defines "neglect" to mean the failure to provide goods and/or services necessary to avoid physical harm, mental anguish or mental illness; and (b) OKLA. STAT. tit. 43A, § 10-103(11) which defines "neglect" to mean:  (1) the failure to provide protection for a vulnerable adult who is unable to protect his or her own interest; (2) the failure to provide a vulnerable adult with adequate shelter, nutrition, health care, or clothing; or (3) negligent acts or omissions that result in harm or the unreasonable risk of harm to a vulnerable adult through the action, inaction, or lack of supervision by a caretaker providing direct services.

144.    By reason of the fact that Nursing Home Care Act defendant' intentional or negligent acts or omissions caused injury to Resident, said Nursing Home Care Act defendant is also liable pursuant to the Nursing Home Care Act, OKLA. STAT. tit. 63, § 1-1939(A) and (B). Plaintiff seeks all damages recoverable and allowed by law under the foregoing statutory provision.

145.    In accordance with OKLA. STAT. tit. 63, §1-1902(16), the owner of a nursing home is defined as follows:

> "Owner" means a person, corporation, partnership, association, or other entity which owns a facility or leases a facility.  The person or entity that stands to profit or loss as a result of the financial success or failure of the operation shall be presumed to be the owner of the facility.

146.    Accordingly, Resident's injuries, pain, and suffering were a direct and proximate result of such statutory violations and negligence *per se* set forth above, operating singularly or in combination.  Furthermore, Plaintiff would show that such statutory violations and negligence *per se* set forth above, operating singularly or in combination, were direct and proximate causes of the damages described more fully herein.

WHEREFORE, Plaintiff seeks compensatory, actual and punitive damages described below, which are incorporated herein for purposes of this *Count*, plus cost of suit, and all other relief to which Plaintiff is entitled by law.

## COMPENSATORY, ACTUAL AND PUNITIVE DAMAGES

147.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows.

148.    As a direct and proximate result of the acts or omissions of Defendants as set forth above, Resident suffered mental anguish, pain, suffering, physical injuries, extreme physical impairment and other subsequent complications and injuries.

149.    As a further direct and proximate result of Defendants' conduct, Resident required medical attention and hospitalization, and incurred liability to pay reasonable and necessary charges for such.

150.    As a direct, natural and proximate result of the acts or omissions of Defendants as set forth above, Resident died, thereby incurring reasonable and necessary charges for funeral, administration and related expenses.

151.    As a direct and proximate result of the previously alleged conduct, all of which was negligent, grossly negligent, willful and wanton, outrageous, reckless, malicious, intentional, and/or threatening to human life, Resident was caused to endure pain, suffering, permanent injury. Indeed, Resident suffered personal injury including pain and suffering, mental anguish, emotional distress, extreme physical impairment, and destruction of dignity.

152.    The scope and severity of Defendants' consciously indifferent actions regarding the welfare and safety of helpless residents such as Resident constitute gross negligence, willful, wanton, oppressive, reckless, malicious and/or intentional misconduct as such terms are understood in law.

153.    Such conduct was undertaken by Defendants without regard to the health and safety consequences to those residents, such as Resident, entrusted to their care. Moreover, such conduct evidences such little regard for their duties of care, good faith, and fidelity owed to Resident as to raise a reasonable belief that the acts and omissions by Defendants set forth above were the result of conscious, willful, malicious, and intentional conduct for Resident's rights and welfare for which Plaintiff seeks punitive damages.

154.   Plaintiff seeks a judgment against Defendants for all compensatory, actual and punitive damages which the law allows and which the Court and which the Jury deems just and fair under the facts of this case, plus costs of suit, and any other relief to which Plaintiff is entitled by law.

155.   Pursuant to the general rules of pleading, OKLA. STAT. tit. 12, § 2008, Plaintiff asserts that the amount sought as damages for claims set forth herein is in excess of seventy-five thousand dollars ($75,000).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

For judgment against all Defendants for actual and compensatory damages for the injuries to Resident, including but not limited to damages for physical injuries, mental pain and anguish, loss of enjoyment, funeral and burial expenses, and expenses for medical care and treatment, all in an amount in excess of $75,000.00.

a.   For judgment against all Defendants for the mental anguish, sorrow and grief, and loss of love, affection, comfort, emotional and pecuniary support, and companionship, consortium and burial expenses;

b.   For judgment against all Defendants for punitive damages in an amount in excess of $75,000.00;

c.   For judgment against all Defendants for prejudgment interest, post-judgment interest, and costs of suit; and

d.   For such other relief as may be just and equitable.

## PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE

Respectfully submitted:


By:  */s/ Ryan J. Fulda*
Ryan J. Fulda, OBA #21184
**FULDA LAW, PLLC**
1800 South Baltimore Avenue, Suite 420
Tulsa, Oklahoma 74119
Telephone & Fax: (918) 550-8109
rfulda@fuldalaw.com
**ATTORNEY FOR PLAINTIFF**